IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PEARLIE DUMAS,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )  CIVIL ACTION NO. 12-00518-N
                                 )
CAROLYN W. COLVIN,[1]            )
Commissioner of Social Security, )
                                 )
        Defendant.               )


ORDER

Plaintiff Pearlie Dumas ("Dumas") filed this action seeking judicial review of a

final decision of the Commissioner of Social Security ("Commissioner") that she was not

entitled to Disability Insurance Benefits (DIB) under Title II of the Social Security Act,

42 U.S.C. §§416(i) and 423, or Supplemental Security Income (SSI) under Title XVI of

the Social Security Act (the Act), 42 U.S.C. §§ 1381-1383c.  Pursuant to the consent of

the parties (doc. 22), this action has been referred to the undersigned Magistrate Judge to

conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §

636(c) and Fed. R.Civ.P. 73.  *See* Doc. 23.  Plaintiff's unopposed motion to waive oral

arguments (doc. 21) was granted on March 7, 2013 (doc. 24).  Upon consideration of the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted
for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit in
view of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

administrative record (doc. 12) and the parties' respective briefs (docs. 13 and 19), the

undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I.      Procedural History.

Plaintiff, Pearlie Dumas ,filed applications for DIB and SSI benefits on November

24, 2008, claiming an onset of disability beginning July 1, 2007 (Tr. 136). Dumas alleged

that her disability was due to a seizure disorder and depression.  (Tr. 151). The

application was denied on February 20, 2009. (Tr. 69-82).  Dumas timely requested a

hearing on March 24, 2009 (Tr. 86) before an Administrative Law Judge ("ALJ").  A

hearing was held on August 17, 2010.  (Tr. 53-68).  The ALJ issued an unfavorable

decision on September 3, 2010.  (Tr. 35-48).  Dumas requested a review by the Appeals

Council (Tr. 27-28), which was denied on July 12, 2012 (Tr. 1-6), thereby making the

ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981 (2009)[2].

Dumas has exhausted all her administrative remedies and now appeals from that final

decision.

II.     Issue on Appeal.

Whether the ALJ erred by failing to find that Dumas suffered from a severe mental

impairment?

III.    Standard of Review.

        A.      Scope of Judicial Review.

---

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

substantially supportive evidence" of the ALJ's decision.  <u>Barron v. Sullivan</u>, 924 F.2d 227, 230 (11th Cir. 1991).

The ALJ is responsible for determining a claimant's RFC, an ingrained principle of Social Security law.  *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level under § 416.1429 or at the Appeals Council review level under § 416.1467, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity.")  "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." <u>Peeler v. Astrue</u>, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. § 416.945(a).  *See also*, <u>Hanna v. Astrue</u>, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010) ("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his ... impairments.'")(*quoting* <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1238 (11th Cir.2004).  "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." <u>Hanna</u>, 395 Fed.Appx. at 635 (citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").  The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete

medical history, including arranging for a consultative examination(s) if necessary," and

helping the claimant get medical reports from her own medical sources. 20 C.F.R. §

416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a

claimant can still do "that have been provided by medical sources," as well as

"descriptions and observations" of a claimant's limitations from her impairments,

"including limitations that result from [ ] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet

the physical, mental, sensory, or other requirements of work, as described in paragraphs

(b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

> (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

> (d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s),

we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d). *See also* <u>Kennedy v. Astrue</u>, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

        B.     <u>Statutory and Regulatory Framework</u>.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. <u>Patterson v. Bowen</u>, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. § 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony from a vocational expert (VE). Id. at 1239–40.

Additionally, to qualify for a period of disability and/or disability insurance benefits, plaintiff must prove he has a medically determinable impairment or impairments of sufficient severity to constitute a disability as contemplated by the Act  and that the impairment or impairments became disabling while he was insured for disability purposes.  The Act places the burden of establishing disability on the plaintiff.

Bloodsworth v. Heckler, 703 F.2d 1233, 1240 (11th Cir. 1983); *see also* 42 U.S.C. §S 423(c)(1); 20 C.F.R. § 404.1512(a).   In order to receive disability insurance benefits or a period of disability, Dumas must establish that her condition became disabling before the expiration of her insured status on March 31, 2007.  Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir. 1981), *cert.  denied*, 455 U.S. 912 (1982)(Claimant "must show that she was disabled on or before the last day of her insured status.").   If a plaintiff becomes disabled after insured status has expired, the claim must be denied despite disability. *See*, Kirkland v. Weinberger, 480 F.2d 46 (5th Cir. 1973); Chance v. Califano, 574 F.2d 274 (5th Cir. 1978); Morgan v. Astrue, 2008 WL 4613060, * 13 (S.D. Fla. Oct. 15, 2008)("If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied, despite her disability."); Benjamin v. Apfel, 2000 WL 1375287, * 3 (S.D. Ala. August 02, 2000)(" If a claimant becomes disabled after her insured status has expired, her claim must be denied despite her disability.")  Dumas's  earnings record shows she was insured through June 30. 2008, but not thereafter (Tr. 144).

IV.   Findings of Fact and Conclusions of Law.

A.  Statement of Facts.

1.  Vocational Background.

Dumas  was 55 years old as of June 30, 2008, the date she was last insured for purposes of DIB, and 57 years old as of September 3, 2010, the date on which the Commissioner's decision became final for SSI purposes (Tr. 136, 144).   The highest grade of school completed by Dumas was one year of college in 2001 (Tr. 156). Dumas's past work experience included work as a teacher assistant, housekeeper, and

stock clerk (Tr. 57, 232). Her most recent job was working June or July 2007 through a "temp service" at a department store stocking shelves for a grand opening (Tr. 57). Dumas stopped working in July of 2007 "when I was diagnosed with having seizures" (Tr. 57). Dumas was insured for a period of disability and Disability Insurance Benefits through June 30, 2008, but not thereafter. (Tr. 144).

      2.   <u>Plaintiff's Testimony</u>.

At the hearing on August 17, 2010, Dumas testified that the arthritis in her knees interferes with or prevents her from working fulltime (Tr. 57). She testified that Franklin Clinic has been treating this problem for about a month and she has required hospitalization for the knee problem (Tr. 58).[4] She contends that the pain occurs every day at a level of seven on a scale of one to ten with ten being the worst (Tr.58-59). She states that she only takes "arthritis" medicine for it and gets only "slight" relief (Tr. 59). She denies any side effects from the medication she takes (Tr. 59).

Dumas further testified that she is single, can feed, bathe and dress herself, and she can shop for groceries and do a little cooking and light housework (Tr. 56, 59-60). She smokes but denies drinking alcohol or using street drugs (Tr. 60). She does not have a drivers' license (Tr. 60).

Dumas also testified that she is able to walk about four blocks before she has to sit down (Doc. 60). She can stand about 15 minutes at a time (Tr. 60) and sit about 20 minutes at a time (Tr. 61). Dumas also testified that she can lift and carry about 15

---

[4] No medical records have been submitted with regard to this alleged hospitalization.

pounds without hurting herself (Tr. 61), can use her hands to pick up small objects, can reach overhead to wash her hair, can push and pull with her hands, and can climb a couple of steps if she has to (Tr. 61-62).  She can also climb a flight of stairs but "it takes time" (Tr. 64).   Dumas also stated that, because of water retention, she is not able to sit for too long without having to go to the bathroom (Tr. 62).  She identified no other difficulty sitting (Tr. 62).

In response to a question about when she had her last seizure, Dumas first stated that it was in 2008 or 2009 when she was kept in Mobile Infirmary Hospital for two and a half days" (Tr. 63).  She then claimed to have had "a mild one" since then (Tr. 63).  She described the seizures as "going on while I'm asleep" (Tr. 63).  She knows it is a mild one if there is only a "nipping of, the biting of my tongue" (Tr. 63).  "If it's real, real heavy I have a severe bite in the back of my, on my tongue" (Tr. 63).  When she wakes up after an episode, she states that she feels "[n]ausea, in a daze . . . and then I'm coherent" (Tr. 64).

Dumas also testified that she can bend over to clean out the tub but it takes time "for my back" (Tr. 64).  In addition to preparing meals for herself, she can sweep and mop the house (Tr. 64).  Dumas described her usual day as follows: at 6:00 am. she gets up and takes her medicine; she fixes breakfast; does a little cleaning; takes medicine around 10:00 a.m.; watches a little TV; takes medicine and then a nap at 2:00 p.m.; gets up and fixes dinner; after dinner, she exercises her knees by rotating them; and takes her bath and last medicine for the day at 10:00 p.m. and goes to bed (Tr. 65).  She again denied any side effects from her medicine (Tr. 65).

3.    Medical Evidence Before the ALJ.

Dumas's relevant medical evidence begins with her visit to the Mobile Infirmary emergency room on December 28, 2007, for a seizure (Tr. 304 – 315).  Dumas was reported to be alert and oriented, and demonstrated normal cranial nerve functioning; equal, round, reactive pupils; normal cerebellar functioning; the absence of sensory or motor deficits; normal reflexes; normal extremity ranges of motion and the ability to move all extremities; and a normal gait (Tr. 307-309).  Her blood chemistries were normal but she did test positive for cocaine resulting in a notation of "substance abuse" (Tr. 307).  She was discharged in stable condition (Tr. 309).

On March 3, 2008, Dumas presented to Altapointe Health Systems  ("Altapointe") with complaints of depression and visual hallucinations (Tr. 239-243).  She was examined by Dr. Billett, a psychiatrist, who diagnosed with schizophrenia or schizoaffective disorder and (Tr. 241-242).  Dr. Billett reported a blunted affect, poor hygiene, and impaired concentration, but also noted that Dumas was oriented and goal directed and demonstrated logical, coherent thoughts and unimpaired memory (Tr. 240-241).  He recommended laboratory studies and psychotherapy and prescribed a trial of Invega[5] and Zoloft[6] (Tr. 242).

---

[5] Invega (paliperidone) is an antipsychotic medication that works by changing the effects of chemicals in the brain and is used to treat schizophrenia.  *See* http://www.drugs.com/invega.html.

[6] Zoloft (sertraline) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs) that affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms. *See* http://www.drugs.com/zoloft.html.

Dumas did not return to Altapointe until July 11, 2008 (Tr. 238). She was seen by Danette Overstreet, a Certified Registered Nurse Practitioner ("CRNP"), who noted that "[s]he is friendly and smiling and neatly dressed with neatly groomed graying hair and br[i]ght clothing" (Tr. 238). Dumas told Overstreet that she was still seeking employment but "does feel overwhelmed and uncertain when she goes for a job interview" (Tr. 238). Overstreet reported that Dumas was "[u]ncertain why she came in today after such a long time since intake but she seems happy to try SSRI, Zoloft today at a lower dose" (Tr.238). According to Overstreet, Dumas "filled but never took either [the "invega 3 mg and zoloft 100mg" ordered by Dr. Billett at her intake on March 3, 2008]" (Tr. 238). Overstreet explained to Dumas "how to titrate up to start and down if needed to stop" these prescription drugs, because Dumas reported being "fearful of side effects" (Tr. 238). Overstreet also reported that Dumas had no suicidal or homicidal ideation, no symptoms of psychosis or mood swing, no self mutilation, and her sleep was good. Overstreet set forth a plan for Dumas to return in one month "or next available [appointment]"and to "restart Zoloft at lower dose, 25 mg in am x 7 days then 50mg daily" (Tr. 238).

Dumas did not return until October 21, 2008, at which time she was seen by Florin Ghelmez, M.D. (Tr. 237). She reported to him that she had stopped taking her Zoloft after she had one of two seizures for which she did not seek medical care "because of insurance problems" (Tr. 237). She also reported "some unusual perceptual experiences like some children in her neighborhood being stuck at the same age or a preacher that died and came back alive" (Tr. 237). Dr. Ghelmez noted, however, that Dumas "does not

seem preoccupied by [these] thoughts [and] [h]er mood is OK despite stopping the Zoloft" (Tr. 237). Dr. Ghelmez also reported that "[s]he says the only reason she came to this clinic is because a cousin told her to [come] so she could get social security" (Tr. 237). Dr. Ghelmez opined that Dumas did not have a psychotic disease but, rather, "schizotypal personality disorder" (Tr. 237). He set forth a plan for Dumas to discontinue Zoloft, continue on no medications and return in three months (Tr. 237).

Dumas was hospitalized at Mobile Infirmary from February 26-28, 2009, with a complaint of a seizure episode the night previous to admission lasting 10 to 15 minutes, without bowel or bladder incontinence (Tr. 279-301). Dumas reported to a consulting physician, John G. Yager, M.D., that she had a previous seizure "maybe a year or two ago" (Tr. 284). A head computerized tomography scan was negative for an acute process (Tr. 289, 300), and she had no seizure activity during hospitalization (Tr. 289). Dumas received a loading dose of Dilantin[7] in three doses of 300 mg on February 27, 2013, and was discharged on February 28, 2009 with a prescription for Dilantin 100 mg three times a day (Tr. 280, 284). Dumas's discharge medications also included hydrochlorothiazide,[8]

---

[7] Dilantin (phenytoin) is an anti-epileptic drug, also called an anticonvulsant, that works by slowing down impulses in the brain that cause seizures and is used to control seizures. *See* http://www.drugs.com/dilantin.html.

[8] Hydrochlorothiazide is a thiazide diuretic (water pill) that helps prevent your body from absorbing too much salt, which can cause fluid retention, and is also used to treat high blood pressure. *See* http://www.drugs.com/hydrochlorothiazide.html.

Lisinopril,[9] and Omeprazole[10] (Tr. 280). Dumas was instructed to "followup with either the Franklin Clinic or USA Neurology (Tr. 284).

Dumas returned to Altapointe on April 3, 2009, to see Dr. Ghelmez because "she needs SSD" (Tr. 316). She told Dr. Ghelmez that she is depressed but he noted:

> She smiles and make[s] small jokes. No psychomotor retardation or agitation. No loss of energy. No concentration problems noted. No hopelessness or helplessness. No racing thoughts. No pressured speech. No irritability. No elevation of the mood. No grandiosity. No [audio or visual hallucinations]. She does not seem preoccupied with delusional thoughts. She told the RN she is 'delusional' but only mentioned numbness on the left side of her back. . . . She is asking me to fill disability papers but it is our policy not to fill those type of papers.

(Tr. 316). Dr. Ghelmez further noted in his plan for Dumas that "[t]his patient has no psychiatric symptoms at this time, therefore needs no follow up appointment [but] she can return to clinic in the future if she has psychiatric problems" (Tr. 316).

Dumas was seen a number of times at Franklin Primary Health Center, Inc. ("Franklin Clinic") between April 9, 209 and June 15, 2010. Specifically, on her April 9, 2009, visit to Franklin Clinic, Dumas received a refill of her antiseizure and antihypertension medications and her records indicate that she demonstrated a normal musculoskeletal, neurological, and mental functioning (Tr. 321-322). On her May 1, 2009, it was noted that Dumas's hypertension was controlled (Tr. 320). On June 15, 2009,

---

[9] Lisinopril is in a group of drugs called ACE inhibitors is used to treat high blood pressure (hypertension). *See* http://www.drugs.com/lisinopril.html. It was noted that Dumas's blood pressure was "well controlled" with the Lisinpril and Hydrochlorothiazide (Tr. 280).

[10] Omeprazole (Prilosec) belongs to group of drugs called proton pump inhibitors that decreases the amount of acid produced in the stomach and is used to treat symptoms of gastroesophageal reflux disease (GERD) and other conditions caused by excess stomach acid. *See* http://www.drugs.com/omeprazole.html.

Christopher L. Hall, M.D., a physician at Franklin, noted normal musculoskeletal and neurological functioning, and concluded that Dumas's seizure disorder and hypertension were stable (Tr. 317-318). On September 8, 2009, Dumas was noted to have normal ranges of motion of the hips and shoulders, and normal neurological functioning, and controlled hypertension (Tr. 327-328).

On December 1, 2009, Dumas reported to the Franklin Clinic that she was not aware of having any seizures since February (presumably 2009) (Tr. 325). The Clinic's progress note reports normal musculoskeletal and neurological functioning (Tr. 325). When Dumas presented at Franklin Clinic on December 30, 2009, a nonphysician provider noted normal neurological functioning, including intact cranial nerve functioning (Tr. 323).

On June 15, 2010, Anita R. Smith, M.D., a physician at Franklin Clinic, examined Dumas (Tr. 218-219, 341-342). Dumas reported that she was out of antiseizure medication but had not had a seizure in one year; and she denied that she was prone to falls (Tr. 341). Examination revealed a small right knee effusion without erythema, and intact cranial nerve functioning (Tr. 341). Dr. Smith diagnosed a seizure disorder and osteoarthritis, and restarted antiseizure medication and prescribed nonsteroidal anti-inflammatory medication (Tr. 324).

On January 12, 2009, Hope Jackson, Ph.D., reviewed the evidence on file and completed a Mental Residual Functional Capacity Assessment based on that review (Tr. 245). Dr. Jackson concluded that Dumas was not significantly limited in her ability to remember locations and work-like procedures; to understand, remember and carry out

16

detailed instructions; to perform activities within a schedule; to maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without unreasonable number and length of rest periods; to ask simple questions or request assistance; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others (Tr. 245-246). The only areas identified by Dr. Jackson as moderately limiting to Dumas included the ability to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting (Tr. 245-246). Dr. Jackson opined that Dumas "can underand [sic] sustain attention for 2hr intervals" (Tr. 247).

An examination of Dumas by Jennifer M. Jackson, Psy.D., a consultative psychologist, on April 19, 2010, revealed that she was oriented and demonstrated no obvious fine or gross motor skill difficulties; her behavior appeared rather dramatic and histrionic; her grooming was good; her mood appeared euthymic, with smiling and occasional laughter; her speech was easily understood; her memory was intact; there were

no signs of confusion; her judgment seemed fair; and she was estimated to function in the average range of intelligence (Tr. 335-337). Dumas informed Dr. Jackson about being treated previously but not currently for depression, and reported seeing a shadow once or twice a year of which she was not afraid (Tr. 334, 337). She also reported being able to stay home unsupervised, to care for her personal needs, to perform household chores, and to shop (Tr. 339). Personality testing revealed a tendency to exaggerate problems in an attempt to appear psychologically disturbed (Tr. 337). Dr. Jackson diagnosed a personality disorder (Tr. 338), and concluded that Dumas's ability to understand, remember, and carry out instructions was not affected by her mental condition and that her abilities to interact appropriately with others, and respond appropriately to usual work situations and to changes in a routine work setting were mildly affected by her mental condition (Tr. 332).

3.    The Administrative Law Judge's Decision.

After considering all of the evidence, the ALJ found that Dumas's hypertension, and osteoarthritis of the left side and knees were severe impairments but that her schizotypal personality disorder was not "severe" and she did not have an impairment or a combination of impairments listed in or medically equal to one listed in 20 C.F.R. pt. 404, subpt. P., app. 1 (Tr. 37-38).

With specific respect to Dumas's complaint of seizures, the ALJ noted that on a "Questionnaire for a Description of seizures and Treatment of Seizures" completed by Dumas February 5, 2009, she claimed to have been having seizures for two years and could not identify the dates for the first two seizures but recalled that the third seizure

took place on November 27, 2008 and lasted 15 minutes (Tr. 40, 181). The ALJ also noted that, during this seizure, Dumas claimed to bite her tongue and have jerking motions of her arms and legs but never lost control over her bladder and, after the seizure, was able to do whatever was being done before the attack and did not remember the attack or how long it lasted (Tr. 40, 181). The ALJ also noted Dumas's hospitalization on February 26 to February 29, 2009 for a seizure episode the night prior to admission (Tr. 43, 279-301). A CT scan of Dumas's head performed during that hospitalization was negative and she exhibited no episodes of seizure activity during the hospitalization (Tr. 43, 289). The ALJ also found that "no physician has been seen recently for treatment of seizures" (Tr. 40) and:

> Attempts to retrieve clinical information regarding the claimant's allegation of seizures has been unsuccessful because claimant has not sought medical attention, the claimant does not take any anti-seizure medication and, therefore, the claimant's seizure activities cannot be measured; therefore those allegations are considered to be non-severe.

(Tr. 43). Dumas does not challenge these findings and conclusions.

The ALJ determined that Dumas's mental impairment did not satisfy the "paragraph B criteria" because she did not have "at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration" (Tr. 38)[11]. The ALJ

---

[11] The ALJ noted that "[a] marked limitation means more than moderate but less than extreme" (Tr. 38).

also rejected the opinion of Dr. Hope Jackson that Dumas had moderate difficulties

maintaining social functioning, concentration, persistence or pace, part of her January 20,

2009 assessment of Dumas's records (Tr. 259)[12], and found that she had only mild

difficulties in those areas (Tr. 38). Although rejecting some of the opinions expressed by

personnel of AltaPointe (Tr. 46), the ALJ found credible the notes by Dr. Ghelmez on

April 3, 2009, disclosing that:

> [C]laimant told her therapist she needs social security disability, as
> claimant spoke of depression but she [smiles] and makes small jokes. No
> psychomotor retardation or agitation was shown. No concentration
> problems were noted. No hopelessness or helplessness, no racing thoughts,
> no pressured speech, no irritability, no elevation of mood, no grandiosity
> with no auditory or visual hallucinations. . . [C]laimant asked for therapist
> to complete disability forms but it is our policy not to fill those type of
> papers.

(Tr. 43, *citing* Tr. 316). The ALJ also assigned significant weight to the report of

Jennifer M. Jackson, Psy.D., an examining consultant clinical psychologist, who reported

that she administered the Minnesota Multiphasic Inventory–II (MMPI-II) test which

revealed that Dumas has "a tendency to exaggerate problems in an attempt to appear very

psychologically disturbed" (Tr. 45, 337). The ALJ found that "[t]his over endorsement of

symptoms is supported by her history as noted in the record from Altapointe Health

System which indicated "no symptoms of psychosis or mood swings," and the last note[]

stated "no psychiatric symptoms at this time." (Tr. 45, 316).

---

[12] Dr. Hope Jackson's January 20, 2009 review was for the period from July 1, 2007 until December 12, 2008 (Tr. 249) while the January 22, 2009 review encompasses July 1, 2007 to June 30, 2008, Dumas's date last insured (Tr. 263). In both reviews, Dr. Hope Jackson opines that Dumas has moderate difficulties (Tr. 249, 273) in areas the ALJ finds merely mild difficulties (Tr. 38, 42-43).

Based on all the evidence of record, particularly the opinion of Dr. Jennifer Jackson, the ALJ concluded that, as of June 30, 2008, and thereafter, Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[13] reduced by limitations from work not allowing mild to moderate postural limitations and avoidance of heights and machinery (Tr. 38). Dumas does not challenge the ALJ's RFC determination on any grounds of physical impairment, such as an inability to satisfy the walking, standing, sitting or lifting requirements. Rather, Dumas challenges only on the basis of an alleged mental impairment.

4.    Vocational Expert Testimony.

The ALJ relied upon the testimony of Barry Murphy, a vocational expert. (Tr. 280-285). Mr. Murphy was asked to give an exertional and skill level of Dumas's most significant past work (Tr. 66). He testified that Dumas's past work as a housekeeper, a teacher's aide, and a retail stock clerk were light jobs (Tr. 66). He also testified that an individual with the residual functional capacity to perform light work reduced by mild to moderate postural limitations and work allowing avoidance of hazards such as dangerous machinery and heights, would be able to perform those jobs (Tr. 66). He further testified that, considering an individual of Dumas's age, educational level, and vocational history, with the residual functional capacity determined by the ALJ, jobs existed in the regional and national economies such an individual could perform (Tr. 66). He testified that such

---

[13] Light work involves sitting two hours, walking and standing six hours, and lifting no more than 20 pounds at a time. See 20 C.F.R. §§ 404.1567(b), 416.967(b) (2012); Social Security Ruling (S.S.R.) 83-10, 1983 WL 31251, at *5.

an individual could perform light, unskilled work as a mail clerk in a non-postal capacity (DOT 209.687-026) with 1800 such jobs available in the state and 250,000 available in the national economy (Tr. 67). He also identified light, unskilled work as a cashier (DOT 211.462-010) with 18,000 such jobs available in the state and 1.5 million available in the national economy (Tr. 67). He also testified that there was light packing job (DOT 920.686-038) with 1200 such jobs available in the state and 350,000 available in the national economy (Tr. 67).

      B.    <u>Analysis</u>.

Dumas argues, in sum, that she "received treatment for more than one year for a mental impairment" and that her mental impairment must be deemed "severe" because, at her intake on March 3, 2008, at Altapointe, Dr. Billett noted her inappropriate general appearance, sad mood, blunted affect, poor hygiene, impaired concentration, vague and circumstantial speech, naive insight and delusions, and opined that she had either schizophrenia or schizoaffective disorder. (Doc. 13 at 4; *see also* Tr. 239-243). Dumas also relies on her visit to Altapointe on July 11, 2008, because she was given another prescription for Zoloft. She also relies on her third visit to Altapointe on October 21, 2009, because "Dr. Ghelmez stated that [she] had a schizotypal personality disorder." (*Id.*; *see also* Tr. 238, 237). Although Dumas acknowledges that she "was released from Altapointe's care on April 3, 2009," her fourth visit, she completely ignores the opinions Dr. Ghelmez reported in the progress note, including his diagnosis that Dumas "has no psychiatric symptoms at this time, therefore needs no follow up appointment (Tr. 237)" and his observation that she came to Altapointe merely to obtain documentation for social

22

security benefits.  Dumas maintains that "[in order for] an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience'." (Doc. 13 at 3, *quoting* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).  In addition to the diagnostic labels attributed to Dumas as set forth above, Dumas relies on the assessment made by Dr. Hope Jackson on January 12, 2009, that she suffers from certain moderate limitations in her ability to maintain attention and concentration for an extended period of time (Tr. 245), to respond appropriately to changes in the work setting (Tr. 246), and to interact appropriately with co-workers, supervisors or the general public (Tr. 246).[14]

The Commissioner argues, in sum, that the ALJ's determination regarding the severity of Dumas's mental impairment was consistent with the opinions of Dr. Ghelmez, Dr. Jennifer Jackson, and Dumas's own statements and was, therefore, supported by substantial evidence.  (Doc. 19 at 11).  The Commissioner further asserts that Dumas's reliance upon the mere diagnosis of psychosis-related mental disorders is misplaced because it is the resultant functional limitations arising from such disorders, if any, that must be used by the Commissioner to formulate a claimant's residual functional capacity. (*Id*., *citing*, 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520, 416.920

---

[14] Dumas also relies on Dr. Hope Jackson's assessments on January 20 and 22, 2009, of moderate limitations associated with social functioning and ability to maintain concentration, persistence and pace (Tr. 259, 273).

(2012) (impairments must be so functionally limiting as to preclude either past work or any other work existing in significant numbers in national economy).

Dumas has the burden of proving her disability by establishing a physical or mental impairment lasting at least twelve months that prevents her from engaging in any substantial gainful activity. *See* Barnhart v. Walton, 535 U.S. 212, 220 (2002); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). Dumas is required to show that her impairments were so functionally limiting as to preclude either her past work or any other work that existed in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520, 416.920 (2012) (an individual who files an application for disability benefits must prove she is disabled). Dumas must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *See* Walton, 535 U.S. at 220.

Further, in order to establish her eligibility for DIB, Dumas must establish that she became "disabled," that is, unable to engage in any substantial gainful activity, prior to the expiration of her insured status. *See* Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir. 1981))(Claimant "must show that she was disabled on or before the last day of her

insured status.").[15] *See also*, <u>Morgan</u>, *supra*, 2008 WL 4613060 at * 13 (If a claimant becomes disabled after she has lost insured status, her claim for disability must be denied, despite her disability). Dumas's earning record shows that she was insured through June 30, 2008, but not thereafter (Tr. 144). Therefore, she was required to establish the onset of disability on or prior to June 30, 2008. Thus, the relevant time period in this case is between July 1, 2007, Dumas's alleged onset date, and June 30, 2008, the date she was last insured, for purposes of DIB.

Despite Dumas's assertions to the contrary, her mental disorder is not severe and the ALJ did not err in failing to find that she suffered a severe mental impairment. The Commissioner does not dispute that Dumas was diagnosed with schizotypal personality disorder. However, the presence of an ailment does not automatically entitle a claimant to disability benefits; there must be a showing of related functional loss or impairment. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). No such functional loss or impairment has been documented in this case. In fact, the record supports the opposite.

In this case, Dr. Ghelmez, a treating physician, declared that Dumas "has no psychiatric symptoms at this time, therefore needs no follow up appointment" (Tr. 237). The medical records contain the following objective findings regarding Dumas's mental functioning: she was goal-directed (Tr. 239), and demonstrated normal behavior and the absence of psychomotor retardation or agitation (Tr. 237, 316), normal speech (Tr. 237-

---

[15] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. <u>Bonner v. City of Prichard, Alabama</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

238, 316, 336-337), logical, coherent thoughts (Tr. 237, 241, 316), normal perceptions (Tr. 237, 316), intact memory (Tr. 237, 241, 316, 336), normal concentration (Tr. 237, 316), the absence of signs of confusion (Tr. 337), and fair judgment (Tr. 337). Dumas was also found to be alert (Tr. 307-309), and oriented (Tr. 241, 307-309, 336), and demonstrated good grooming (Tr. 237-238, 316, 335), a normal, euthymic mood, with smiling and occasional laughter (Tr. 237, 316, 336), an appropriate affect (Tr. 237, 316), and estimated average intellectual functioning (Tr. 337). In addition, Dumas denied experiencing hallucinations (Tr. 237), or reported seeing a shadow once or twice a year of which she was not afraid (Tr. 337); and Dr. Ghelmez noted that Plaintiff did not appear preoccupied with delusional thoughts (Tr. 316). Dumas also reported having an "OK" mood despite discontinuing antidepressant medication (Tr. 237) and Dr. Ghelmez concluded that she required no follow up appointment and recommended continuing treatment with no medication (Tr. 237, 316). These favorable objective medical findings clearly support the ALJ's decision. *See* Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987)(Upheld ALJ's finding that "[a]lthough the claimant alleges symptomatology of a disabling nature, his symptoms are not fully corroborated by laboratory and clinical findings."). *See also* Bowen v. Yuckert, 482 U.S. 137, 154 (1987), in which the Supreme Court acknowledges that a ruling had issued from the Secretary of Social Security "[t]o clarify the policy for determining when a person's impairment(s) may be found 'not severe'....," providing, in pertinent part:

> "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight

> abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered ( i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)."

482 U.S. at 154, n. 12, *quoting* Social Security Ruling 85–28 (1985).

In light of the above findings from Dumas's medical records, her reliance on the assessments of a non-treating, non-examining consultant, Dr. Hope Jackson, is misplaced. The ALJ is required to consider several factors when evaluating all medical opinions, including the length of the treatment relationship, the extent of the treatment Relationship, the consistency of the opinion with other evidence, the physician's specialization, and the degree to which the opinion is supported by the evidence. 20 C.F.R. §§ 404.1527(c), 416.927(c) (2012). The ALJ should also explain the weight given to the opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). In this case, Dr. Ghelmez, a treating physician, concluded that Dumas had no psychiatric symptoms (Tr. 316). Similarly, Dr. Jennifer M. Jackson, an examining clinical psychologist, concluded that Dumas's ability to understand, remember, and carry out instructions was not affected by her mental condition; and that her abilities to interact appropriately with others, and respond appropriately to usual work situations and to changes in a routine work setting were only mildly affected by her mental condition (Tr. 332). The opinions of Drs. Ghelmez and Jennifer M. Jackson were supported by the favorable objective medical findings discussed above.

The ALJ's decision regarding Dumas's mental functioning was also consistent with the opinion of Dr. Ghelmez, her treating psychiatrist. If the Commissioner finds that a

treating source's opinion on the issues of the nature and severity of the claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record, the Commissioner will give it controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2012); *see also* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997) (treating physician testimony must be given substantial or considerable weight unless good cause is shown to the contrary.).

The ALJ's decision regarding Plaintiff's mental functioning was also consistent with the opinion of Dr. Jennifer M. Jackson, an examining licensed psychologist. *See* <u>Flowers v. Commissioner of Social Security</u>, 441 Fed.Appx. 735, 742 (11th Cir. 2011) ("[A]n ALJ generally gives treating and examining physicians' opinions more weight."). Even evidence from a non-examining, non-treating physician can be relied upon when it is consistent with the record. *See e.g.,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584-85 (11th Cir. 1991) ("[T]he report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence."); <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984)("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record [but] the testimony of a non-examining physician can be relied upon when it is consistent with the record."). *See also,* <u>KDB ex rel. Bailey v. Social Security Administration Commissioner</u>, 444 Fed.Appx. 365, 367 (11th Cir. 2011)("[A]dministrative law judges must consider findings and other opinions of State agency medical and psychological consultants and

other program physicians, psychologists, and other medical specialists as opinion evidence" of non-examining sources.), quoting 20 C.F.R. § 404.1527(f)(2)(i). S.S.R. 96-6p, 1996 WL 374180, at *2-3 (findings made by State agency physicians must be treated as expert opinion evidence). The ALJ in this case appropriately assigned significant weight to Dr. Jennifer Jackson's assessment of Dumas.

Dumas herself reported that she required no special reminders to care for her personal needs or to take medication (Tr. 175); that she could stay home unsupervised (Tr. 339), and go out alone (Tr. 176-177); and that her condition did not affect her abilities to complete tasks, understand, or follow instructions (Tr. 178). The Commissioner may rely on a claimant's own statement of limitations in evaluating disability. *See* McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

Since the ALJ's determination with respect to the severity of Dumas's mental impairment was consistent not only with the opinions of Drs. Ghelmez and Jennifer M. Jackson, but Dumas's own statements, substantial evidence supported the ALJ's assessment of Dumas's functional limitations in this case. Dumas's reliance upon the mere diagnoses of psychosis-related mental disorders by Drs. Billett, Ghelmez, and Jennifer M. Jackson, is misplaced because the mere diagnosis of a disorder, absent any resultant functional limitations, is insufficient to formulate a claimant's residual functional capacity. See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520, 416.920 (2012) (impairments must be so functionally limiting as to preclude either past work or any other work existing in significant numbers in the national economy).

In contrast, Dr. M. Hope Jackson's findings of moderate limitations in certain specific areas of mental functioning, were not consistent with either the opinions of Dumas's treating physician, Dr. Ghelmez, or examining consultant, Dr. Jennifer Jackson, or Dumas's own statements.  Evidence from a non-examining, non-treating physician can be relied upon only when it is consistent with the record.  Jarrett v. Commissioner of Social Sec., 422 Fed.Appx. 869, 873 (11th Cir. 2011)("The weight due to a non-examining physician's opinion depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence.").

The Commissioner also distinguishes between summary conclusions derived from the evidence, as were Dr. Hope Jackson's findings (Tr. 245-246), which merely aid in deciding the presence and degree of functional limitations and the adequacy of documentation, and do not constitute the residual functional capacity assessment, *see* Program Operations Manual System (POMS) § DI 24510.060B.2, and the actual mental residual functional capacity assessment. *See* POMS § DI 24510.060B.4.  Moreover, it is the ALJ's duty under the regulations to review the evidence and make the requisite findings of fact and conclusions of law, including the determination of a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946 (2012).  It was not a duty delegated to Dr. Hope Jackson.

In addition to the objective medical evidence discussed above, the ALJ expressly considered  activities in which Dumas engaged, and concluded that she had only a mild limitation in activities of daily living (Tr. 38-43, 45).   Dumas cared for her personal

needs without difficulty (Tr. 59, 65, 173-174, 240, 339), performed household chores (Tr. 60, 64-65, 173, 175, 339), prepared complete meals (Tr. 64-65, 173, 175), used public transportation (Tr. 176), shopped (Tr. 60, 173, 176, 339), and attended church services (Tr. 177). The ALJ may consider evidence regarding a claimant's daily activities in assessing credibility. *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987)("The regulations do not, however, prevent the ALJ from considering daily activities at the fourth step of the sequential evaluation process."). *See also* Strouse v. Colvin, 2013 WL 3063718, * 7 (M.D.Fla. June 18, 2013)("The ability to engage in everyday activities of short duration such as housework or fishing does not disqualify a claimant from receiving disability benefits [but] an ALJ may properly rely on a claimant's daily activities, among other evidence, in assessing a claimant's credibility."). The ALJ also noted in his decision (Tr. 41) that Dumas reported seeking employment, albeit with difficulty (Tr. 238). *See* Turner v. Commissioner of Social Security, 182 F. App'x 946, 949 (11th Cir. 2006)(Social Security disability claimant's activities including her admission that she looked for work while she was allegedly disabled, were inconsistent with her complaints of disabling symptoms).

Dumas also made statements which indicated to her treating physician that she was seeking mental health treatment only to obtain Social Security benefits. She told Dr. Ghelmez in October 2008, that she came because a relative "told her to so she could get Social Security" (Tr. 237); and in April 2009, that she "need[ed] SSD[,]" at which time Dr. Ghelmez noted multiple inconsistencies on examination and concluded that Dumas had no psychiatric symptoms (Tr. 316). The records also reflect that Dumas declined

medication for reported magical thinking (Tr. 238) and "filled but did never took either" the invega or Zoloft prescribed at her first visit to Altapointe (Tr. 238). It is proper for ALJ to consider failure to seek treatment. *See* Mack v. Commissioner of Social Security, 420 Fed.Appx. 881, 882-883 (11th Cir. 2011)("An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the [SSA] determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability.")(*quoting* SSR 82–59 at 2 (1982)); see also 20 C.F.R. §§ 404.1530;  u, 848 F.2d 1211, 1213 (11th Cir.1988)(failure to follow prescribed medical treatment will preclude a finding of disability); Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984)(ALJ properly considered claimant's "failure to seek treatment after June 1981 (until after the denial of benefits by the administrative law judge).").

Additionally, Dr. Jennifer M. Jackson noted, *inter alia*, that personality testing revealed a tendency of Dumas to exaggerate problems (Tr. 336-337).  *See* Anderson v. Barnhart, 344 F.3d. 809, 815 (8th Cir. 2003) (*citing* Jones v. Callahan, 122 F.2d 1148, 1152 (8th Cir. 1997) (an ALJ may consider evidence that a Social Security disability claimant exaggerated his symptoms when evaluation the claimant's subjective complaints of pain)); Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990) (false or exaggerated responses are entitled to weight in determining whether an impairment existed). In view of the inconsistencies in the record, the ALJ was permitted to disbelieve Dumas's subjective complaints of disabling limitations.

The ALJ correctly determined that, considering the record as a whole, Dumas could perform a reduced range of light work. The ALJ's decision was supported by substantial evidence and is a correct application of the law and regulations.

CONCLUSION.

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the decision of the Commissioner denying plaintiff's application for disability benefits is supported by substantial evidence and is due to be and is hereby **AFFIRMED**.

Done this __26th__ day of August, 2013.


/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**